1  Thomas M. Robins, III (State Bar No. 054423)
     trobins@frandzel.com
2  Craig A. Welin (State Bar No. 138418)
     cwelin@frandzel.com
3  Bernard R. Given II (State Bar No. 134718)
   bgiven@frandzel.com
4  FRANDZEL ROBINS BLOOM & CSATO, L.C.
   6500 Wilshire Boulevard
5  Seventeenth Floor
   Los Angeles, California  90048-4920
6  Telephone:  (323) 852-1000
   Facsimile:  (323) 651-2577
7
   Attorneys for Plaintiff and Counter-Defendant
8  BUILDERS BANK

9              **UNITED STATES BANKRUPTCY COURT**

10              **CENTRAL DISTRICT OF CALIFORNIA**

11              **SAN FERNANDO VALLEY DIVISION**

| 12 | In re | CASE No. 09-24657-GM |
|---|---|---|
| 13 | CARBON BEACH PARTNERS, LLC, a Delaware corporation, | Adv No. 1:10-ap-01184-GM |
| 14 | | Chapter 11 |
| 15 | Debtor and Debtor in Possession. | **NOTICE OF MOTION AND MOTION BY PLAINTIFF AND COUNTER-DEFENDANT BUILDERS BANK TO DISMISS THE FIRST-FOURTH CLAIMS OF THE SECOND AMENDED COUNTER-CLAIM FOR FAILURE TO STATE A CLAIM UNDER FEDERAL RULE OF BANKRUPTCY PROCEDURE 7012(b); MEMORANDUM OF POINTS AND AUTHORITIES** |

16  BUILDERS BANK, an Illinois banking
17  corporation,

18              Plaintiff,

19        v.

20  CARBON BEACH PARTNERS, LLC, A
    Delaware corporation, MARK ROSS,
21  individually and as Trustee of the ROSS
    FAMILY TRUST Under Trust Agreement
22  dated November 16, 1999; ALLISON
    BROWN ROSS, as Trustee of the ROSS
23  FAMILY TRUST Under Trust Agreement
    dated November 16, 1999; and DOES 1
24  through 100, inclusive,

25              Defendants.

**[Filed and served concurrently with Request for Judicial Notice]**

Date:        TBD
Time:        TBD
Courtroom:  303

26

27

28

769134.1 | 100170-0011

# <u>TABLE OF CONTENTS</u>

**Page**

I.    INTRODUCTION ........................................................................................................ 3

    A.    Prior Proceedings. ......................................................................................... 3

    B.    Allegations of SACC. .................................................................................... 4

    C.    The Claims For Relief. ................................................................................... 9

II.    PLEADING STANDARDS APPLICABLE TO SACC ................................................ 10

    A.    Standard on a Rule 12(b)(6) Motion to Dismiss. ......................................... 10

    B.    Court May Judicially Notice and Consider Documents Alleged In But Not
        Attached to the Complaint or Which Are Integral to and Relied on by the
        Complaint. ..................................................................................................... 11

    C.    Pleading Rules for Fraud Claims. ................................................................. 14

III.    BUILDERS' REQUEST FOR JUDICIAL NOTICE ................................................ 15

IV.    DISCUSSION ......................................................................................................... 23

    A.    The Fraud Claim Must Be Dismissed. .......................................................... 23

    B.    No Joint Venture Agreement Claim. .............................................................. 24

V.    CONCLUSION ......................................................................................................... 26

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

NOTICE OF MOTION AND MOTION BY BUILDERS BANK TO DISMISS THE FIRST-FOURTH CLAIMS OF
THE SECOND AMENDED COUNTER-CLAIM FOR FAILURE TO STATE A CLAIM

1

# TABLE OF AUTHORITIES

2

Page(s)

3 FEDERAL CASES

4 *Ashcroft v. Iqbal,*
   129 S. Ct. 1937 (2009) ("*Iqbal*") .................................................................. 10, 11
5

6 *Bell Atlantic Corp. v. Twombly,*
   550 U.S. 544 (2007) ("*Twombly*")................................................................. 10, 11

7 *Branch v. Tunnell,*
8   14 F.3d 449 (9th Cir. 1994) ..................................................................... 11

9 *Caviness v. Horizon County Learning Center. Inc.,*
   590 F.3d 806 (9th Cir. 2010) ("*Caviness*") ................................................ 10
10

11 *Cortec Indus., Inc.* v. *Sum Holding LP,*
   949 F. 2d 42 (2d Cir. 1991) ...................................................................... 12

12 *Desaigoudar v. Meyecord,*
13   223 F.3d 1020 (9th Cir. 2000) .................................................................. 14

14 *Exergen Corp. Walmart Stores, Inc.,*
   *575 F.3d 1312, 1329 (Fed. Cir. 2009).* ................................................... 14
15

16 *Fech v. Price Co.,*
   70 F.3d 1078 (9th Cir. 1995) .................................................................... 12

17 *Galbraith v. County of Santa Clara,*
18   307 F.3d 1119 (9th Cir. 2002) .................................................................. 11

19 *In re Glenfed, Inc. Securities Litigation,*
   42 F.3d 1541 (9th Cir. 1994) .................................................................... 14
20

21 *In re Stac Electronics Securities Litigation,*
   89 F.3d 1399 (9th Cir. 1996) .................................................................... 12

22 *In re Washington Trust Deed Service Corp.,*
23   224 B.R. 109 (9th Cir BAP 1998) ........................................................ 14, 15

24 *Knievel v. ESPN,*
   393 F.3d 1068 (9th Cir. 2005) ............................................................. 11, 12
25

26 *Moore v. Kayport Package Express, Inc.,*
   885 F.2d 531 (9th Cir. 1989.) .................................................................. 14

27 *Parrino v. FHP, Inc.,*
   146 F.3d 699 (9th Cir. 1998) .................................................................... 12
28

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

769134.1 | 100170-0011

ii

*Paulsen v. CNF, Inc.,*
    559 F.3d 1061 (9th Cir. 2010) ............................................................... 10

*PM Factors Inc. v. Kreisel (in re Kreisel),*
    399 B.R. 679 (Bankr. C.D. Cal. 2008) ............................................. 14

*Rennick v. O.P.T.I.O.N. Care, Inc.,*
    77 F.3d 309 (9th Cir. 1996) .......................................................... 24, 25

*Von Saker v. Norton Simon Museum of Art at Pasadena,*
    578 F.3d 1016 (9th Cir. 2009.) ..................................................... 13

## STATE CASES

*Beck v. American Health Group Internat., Inc.,*
    211 Cal.App.3d 1555 (1989) ........................................................ 24, 25

*Conrad v. Bank of America,*
    48 Cal.App.4th 133 (1996) ................................................................ 23

*Kruse v. Bank of America,*
    202 Cal.App.3d 38 (1988) ................................................................. 23

*Laks v. Coast Fed. Sav. & Loan Assn.,*
    60 Cal.App.3d 885 (1976) ................................................................. 23

*Lazar v. Superior Court,*
    12 Cal.4th 631 (1996) ....................................................................... 23

## RULES

Federal Rule of Bankruptcy Procedure 7009 .................................................... 14

Federal Rule of Civil Procedure 9(b) .................................................... 14, 23

Federal Rule of Civil Procedure 12(b)(6) .......................................... 1, 3, 10, 12, 13

FRE 106 ............................................................................................. 12

Rule 56 ............................................................................................. 11

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

NOTICE OF MOTION AND MOTION BY BUILDERS BANK TO DISMISS THE FIRST-FOURTH CLAIMS OF
THE SECOND AMENDED COUNTER-CLAIM FOR FAILURE TO STATE A CLAIM

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

1  CARBON EACH PARTNERS, LLC, a
   Delaware corporation,

2

3                Plaintiff,

4  v.

5  BUILDERS BANK, an Illinois banking
   corporation, ROBB EVANS &
6  ASSOCIATES, LLC, a California limited
   liability company,

7                Defendants.

8

9  **TO ALL PARTIES AND TO THEIR RESPECTIVE ATTORNEYS OF RECORD:**

10  **PLEASE TAKE NOTICE** that on a date and time to be determined by the Court, in

11  courtroom 303 of the above-captioned Court, located at 21041 Burbank Blvd., Woodland Hills,

12  California 91367, Honorable Geraldine Mund presiding, plaintiff and counter-defendant Builders

13  Bank ("Builders") will move the Court for an order dismissing first-fourth claims for fraud and

14  breach of contract of the second amended counter-claim (SACC) of Carbon Beach Partners, LLC

15  ("Carbon Beach"), on file in the above-captioned matters, for failure to state a claim for relief.

16         Said motion will be based on Federal Rule of Civil Procedure ("FRCP") 12(b)(6) (as

17  incorporated into Federal Rule of Bankruptcy Procedure ("FRBP") 7012) and made on the

18  grounds that fails to state facts sufficient to constitute a claim for relief against Builders on any

19  theory.

20         Said motion will be based upon this notice, the attached memorandum of points and

21  authorities, the Request for Judicial Notice ("RFJN")  and upon all pleadings, documents and

22  records on file in this action, and such other and further evidence and argument as may be

23  produced at the hearing of this matter.

24  / / /

25  / / /

26  / / /

27  / / /

28         **NOTE,** pursuant to Local Bankruptcy Rule 9013-1(f) any written response must be filed

NOTICE OF MOTION AND MOTION BY BUILDERS BANK TO DISMISS THE FIRST-FOURTH CLAIMS OF
THE SECOND AMENDED COUNTER-CLAIM FOR FAILURE TO STATE A CLAIM

1    **NOTE**, pursuant to Local Bankruptcy Rule 9013-1(f) any written response must be filed

2    and served at least 14 days before the hearing.

3

4    DATED:  December __, 2010        FRANDZEL ROBINS BLOOM

5                                           & CSATO, L.C.
                                       THOMAS M. ROBINS, III

6                                       CRAIG A. WELIN
                                       BERNARD R. GIVEN II

7

8                                       By:   /s/ Thomas M. Robins, III
                                           _____
                                           THOMAS M. ROBINS, III

9                                           Attorneys for Plaintiff and Counter-Defendant
                                           BUILDERS BANK

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

769134.1 | 100170-0011
2
NOTICE OF MOTION AND MOTION BY BUILDERS BANK TO DISMISS THE FIRST-FOURTH CLAIMS OF
THE SECOND AMENDED COUNTER-CLAIM FOR FAILURE TO STATE A CLAIM

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

1    **MEMORANDUM OF POINTS AND AUTHORITIES**

2        Plaintiff and counter-defendant, Builders, respectfully submits the following memorandum

3    of points and authorities and argument in support of its motion to dismiss certain of the causes of

4    action against Builders contained in the SACC of Carbon Beach:

5                    **I.    INTRODUCTION**

6    **A.    Prior Proceedings.**

7        On June 29, 2010, this Court was presented with Builders' motion to dismiss for failure to

8    state claim under FRCP 12(b)(6), which was not opposed.  The Court's tentative ruling stated that if

9    an amended counter-claim was filed prior to the hearing then the motion would be taken off

10   calendar as moot.  If a first amended counter-claim was not so filed, the motion would be deemed

11   granted with leave to amend.  Ultimately, after the hearing Carbon Beach filed a first amended

12   counter claim ("FACC").  Builders' filed a motion to dismiss the FACC.  This Court granted in part

13   and denied in part that motion on October 1, 2010, granting the motion to dismiss the fraud claims

14   (first and fourth claims for relief) and denying the motion as to the balance of the claims.  Carbon

15   Beach has now filed the SACC alleging the identical claims set forth in the FACC.  Except for some

16   detail as to the alleged negotiations between the parties, the SACC is identical in all respect to the

17   allegations of the FACC.  As discussed below, the newly-added allegations, largely incomplete

18   descriptions of actual e-mails and letters between the parties, adds nothing material with respect to

19   the fraud claims that were previously dismissed and render the fraud and joint venture agreement

20   claims fatally defective as well, when considered with the matters of which this Court should take

21   judicial notice, including the entire contents of the actually-referenced e-mails and letters, the

22   contents of e-mails/correspondence inferentially referenced, and other matters deliberately omitted

23   from the SACC but which the Ninth Circuit has recognized are properly the subject of judicial

24   notice given their relationship to the other matters alleged in the SACC.

25   / / /

26   / / /

27   / / /

28   / / /

NOTICE OF MOTION AND MOTION BY BUILDERS BANK TO DISMISS THE FIRST-FOURTH CLAIMS OF
THE SECOND AMENDED COUNTER-CLAIM FOR FAILURE TO STATE A CLAIM

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

## B. Allegations of SACC.

The SACC and FACC are essentially the same.[1] Carbon Beach alleges that in August 2004, it began construction of an eight unit luxury condominium project on Pacific Coast Highway in Malibu and, in connection therewith, entered into a construction loan with Builders, with Mark and Allison Ross as guarantors. (SACC ¶¶ 8-10.) Paragraph 12 alleges: " . . . [T]he Bank demanded that owners or affiliates of Carbon Beach invest more funds into the Project. There were a series of discussions between the Bank and Carbon Beach and certain owners of the Carbon Beach or their principals as to a modification of the Builders' Loan, but the parties were unable to come to terms with a loan modification with Carbon Beach staying in control of and finishing the Property. The loan modification discussions were then abandoned." Carbon Beach alleges that "[t]hrough a series of telephone conversations, e-mails, mail correspondence and meetings in the summer/fall 2008, the Bank and Carbon Beach . . . negotiated a Joint Venture/Partnership regarding the Project and its funding and completion going forward (the 'Negotiations')," under which it is alleged that "the Bank agreed that it would fund the completion of the Project using its own advisors and it would negotiate and fund settlements with mechanics' lien claimants who had filed liens against the Property prior to summer 2008." (Id., ¶ 16.)[2] In exchange, Carbon Beach alleges, it "would agree

---

[1] For comparison, ¶¶ 1-17 are the same in both pleadings. Paragraph 18 is the same except it adds the word "permanent" in front of "appointment of receiver." The following paragraphs of the SACC are the same or essentially the same as the corresponding paragraphs in the FACC (with FACC paragraphs nos. in parenthesis): ¶¶ 19-20 (19), 23 (21), 29 (23), 30 (24), 31 (25), 32 (34), 33 (26), 34 (27) 35 (28), 36 (29), 37 (30), 38 (31), 39 (32), 40 (33), 42 (35), 43 (36), 44 (37), 45 (38), 46 (39), 47 (40), 48 (41), 49 (42), 50 (43), 51 (44), 52 (45), 53 (46), 54 (47), 55 (48), 56 (49), 57 (50), 58 (51), 59 (52), 60 (53), 61 (54), 62 (55), 63 (56), 64 (57), 65 (58), 66 (59), 67 (60), 68 (61) 69 (62), 70 (63), 71 (64), 72 (65), 73 (66), 74 (67), 75 (68), 76 (69), 77 (70), 78 (71), 79 (72), 80 (73), 81 (74), 82 (75), 84 (77), 85 (78), 86 (79), 87 (80), 88 (81), 89 (82), 90 (83), 91 (84), 93 (86), 94 (87), 95 (88), 96 (89), 97 (90), 99 (92), 100 (93), 101 (94), 102 (95), 103 (96), 104 (97) 105 (98), 106 (99), 108 (101), 109 (102), 110 (103), 111 (104), 112 (105), 114 (107).

[2] In ¶¶ 13-14 and ¶ 16, Carbon Beach alleges: "[T]he Bank proposed a different scenario whereby it would become partners with Carbon Beach and the Bank would finish the Property and split profits with Carbon Beach once the Bank's outstanding debt had been paid. . . . [T]he Bank believed that the Property was worth more than the amount of the Bank's debt at that time. The Bank therefore approached Carbon Beach and its owners with a business proposition above and beyond what was necessary to repay the Bank's loan from the sale of its collateral or a loan modification. The Bank wanted more than repayment of its loan; the Bank and its controlling officer, Mitchell Saywitz . . ., had a vision of what the Property could be and how the Bank, as an equity participant, could make equity returns after its debt from Carbon Beach was paid." (¶ 13.) "Saywitz wanted to be a developer of the property, . . . to make certain changes to the Property according to his own design aesthetics, . . . [and] the Bank share in the increased value . . . above and beyond the equity value that would be realized from the current site plans and developments
        (footnote continued)

NOTICE OF MOTION AND MOTION BY BUILDERS BANK TO DISMISS THE FIRST-FOURTH CLAIMS OF
THE SECOND AMENDED COUNTER-CLAIM FOR FAILURE TO STATE A CLAIM

1    to or not contest the **permanent** appointment of a receiver[3] to allow the Bank to control the

2    completion of the Project" (emphasis added), upon completion of which Builders' secured loan

3    would be repaid and the profits from the sale would be split with Carbon Beach 50-50. (¶ 18.)

4         Carbon Beach alleges that the "Negotiations" were conducted by Mitchell Saywitz,

5    President of Builders, Shannon Eidman, its Senior Vice President and Regional Manager, and Dan

6    Ruvalcaba of Builders and Carbon Beach managers, Mark Ross, Michael Kest and Renee Davis.

7    (¶ 19.) The FACC identifies specific meetings, starting with a September 8, 2008 meeting at the

8    offices of Goldrich & Kest attended by Saywitz, Shannon Eidman, Dan Ruvalcaba for Builders, and

9    Michael Ross, Michael Kest and Renee Davis for Carbon Beach and that "[a]nother meeting to

10   continue the Negotiations took place on October 15, 2008 attended by Kest, Ross, Saywitz and

11   others at Builders' offices." Also, counsel for Builders, Craig Welin, and counsel for Carbon Beach,

12   Cynthia Futter, "attended some of those meetings where the Negotiations occurred." (¶¶ 19, 20,

13   22.) Carbon Beach further alleges a conference call between Saywitz, Ross, Kest and others on

14   October 29, 2008. (¶ 21.) Paragraph 23 alleges: "in addition to the emails and meetings," on

15   several occasions "in September and October, Saywitz and Ruvalcaba spoke by telephone with

16   Kest, Ross and Davis regarding the details of this joint venture/partnership between Builders and

17   Carbon Beach." Paragraph 24, which is new, alleges as follows:

18       The communications regarding the Joint Venture/Partnership were
extensive. Some examples of specific statements are as follows:
19   (the "Joint Venture/Partnership statements"):

20   (a) Saywitz and Ross spoke by telephone on October 8, 2008 and
Saywitz suggested the Joint Venture/Partnership between
21   Carbon Beach and the Bank where the Bank would take control
of the Property and would receive, among other things, its

22

23   _____

specifications." (¶ 14.) "It was absolutely assumed and agreed that the Bank would be repaid its loan, but the
24   discussions and agreements between the Bank and Carbon Beach and Mr. Saywitz went to development and equity
opportunities, not repayment of the Bank's loan." (¶ 15.)

25   [3] The original and FACC had alleged that Carbon Beach's agreed exchange was to not contest the "appointment
of a receiver," referring to the original ex parte appointment on October 2, 2008, not the "permanent" appointment of
26   one, which occurred in November 2008. The upshot of the change is that the ex parte appointment of the receiver was
not a "quid quo pro" for any agreement by Builders <u>and</u> the Receiver was already in place and performing by the time
27   of the confirmation hearing. The SACC nowhere alleges that but for some supposed agreement it would or could
have successfully opposed confirmation.

28

769134.1 | 100170-0011

NOTICE OF MOTION AND MOTION BY BUILDERS BANK TO DISMISS THE FIRST-FOURTH CLAIMS OF
THE SECOND AMENDED COUNTER-CLAIM FOR FAILURE TO STATE A CLAIM

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

1    construction costs and a development fee and the parties would
2    share the profits.

3    (b) By email dated October 8, 2008 (the "Oct. 8 email") to Ross
     with copies to Ruvalcaba and Eidman, Saywitz outlined the
4    parameters of the Joint Venture/Partnership discussed and
     confirmed that among other things the Bank wanted "unfettered
5    control" over the Project and the parties would share the profits.

6    (c) The Oct. 8 email specifically stated that "that the Bank is in a
     unique position because in today's difficult environment it is a
7    reliable source of funds."

8    (d) On October 15, 2008 Saywitz, Ruvalcaba, Welin, and Ross
     among others met at the Bank's offices in Los Angeles and again
9    discussed the terms of the Joint Venture/partnership.

10   (e) By letter dated October 17, 2008 to Ross, Eidman identified the
     specific terms of the Joint Venture/Partnership (the "Oct. 17
11   letter"). The Oct. 17 letter states among other things that in
     exchange for Carbon Beach's consent to the appointment of a
12   receiver who will control the Project, the bank and Carbon
     Beach will share profits and Ross and A. Ross will be released
13   from their Guaranty.

14   (f) The October 8 [sic, should be 17] letter further states, "This
     Profit Participation shall be inclusive in the event the bank's note
15   is paid in full prior to completion of the development or sale of
     the Property" and "The Bank will be paid a
16   modification/extension fee in the amount of $500,000."

17   (g) On October 29, 2008, Saywitz, Ruvalcaba, Eidman again met
     with Kest and Ross among others to discuss the terms of the
18   Joint Venture/Partnership.

19   (h) By letter dated October 31, 2008 (the "Oct 31 letter") to Ross,
     Eidman outlined the terms of the Joint Venture/Partnership
20   including the repayment of Carbon Beach's investment in the
     project before the parties share in the profits from the sale of the
21   units or project.

22   (i) By email dated November 4, 2008 to Ross, Ruvalcaba stated that
     the Bank's lawyers had begun documenting the Joint
23   Venture/Partnership.

24   (j) By email dated November 9, 2008 to Ross, Saywitz agreed to
     keep Ross and Kest advised of the progress of the Project.

25   (k) By email dated November 11, 2008 to Ross, Davis and Kest
     Investment Group with a copy of Ruvalcaba, Saywitz stated that
26   the bank had received the documents memorializing the Joint
     Venture/Partnership from its attorneys and was commenting on

27

28

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

1    them.  The revised Joint Venture/Partnership documents would

2    be forwarded to Carbon Beach by November 13 or 14.[4]

3    Paragraph 25 alleges that "[d]espite repeated assurances that the Joint Venture/Partnership

4    agreement documents were forthcoming, the Bank failed to provide them to Carbon Beach."[5]

5    Carbon Beach alleges in conclusory fashion that "[n]onetheless," the alleged Joint

6    Venture/Partnership continued, Carbon Beach "relied on its existence" and "both parties acted

7    accordingly" and "Saywitz insisted that Carbon Beach agree to replacement of the construction

8    manager with the Bank's construction manager thus having the Project completely under his and the

9    Bank's control." (¶¶ 26-27.)  Paragraph 28 alleges that in or about mid April 2009 Saywitz sent an

10   email to Futter "stating that the parties should document their deal."

11   In ¶ 29, Carbon Beach sets forth the alleged terms of the deal, though as was the case with

12   the original and FACC, it nowhere alleges the date by which such agreement was supposedly

13   agreed to in its final form.  It claims that the "Joint Venture/Partnership was separate and apart from

14   the Builders Loan and Loan Documents [and[ [i]t was agreed that the Builders loan would continue

15   in force and effect except that payment would be delayed until the Bank had completed the Property

16   and the units were sold." (¶ 30.)

17   In ¶ 31, Carbon Beach alleges that Builders filed its complaint seeking, among other things,

18   judicial foreclosure and the appointment of a receiver on September 29, 2008.  In the original cross-

19   complaint, Carbon Beach alleged that "[s]olely in reliance on the Joint Venture/Partnership, Carbon

20

---

21   [4] Builders' Request for Judicial Notice ("RFJN") requests judicial notice of many of the actual emails and letters
22   referenced in this paragraph.  As the Court can see from these Exhibits (and the description of their contents in § III,
     below) Carbon Beach's "summary" of their contents is largely misleading and omits key portions thereof, such as the
23   caveats that appeared in the October 8, 17 and 31, 2008 email exchanges that nothing was binding until reflected in a
     written agreement acceptable to both parties.  As discussed below in § IIB, it is entirely proper for the Court to
24   consider these matters in ruling on the motion without converting it to a motion for summary judgment.

     [5] Because the SACC is allegedly based on communications between September 2008 and September 2009, the
25   actual communications that did occur are "integral" to the SACC and, since they are indisputable (i.e. many are out of
     the mouth of Carbon Beach's counsel) it is also proper for the Court to consider them on this motion without
26   converting it to a motion for summary judgment.  (See § IIB, below.)  Thus, RFJN Exhibits 19 and 31 show that in
     late November 2008 proposed contract documents were sent by Builders to Carbon Beach, whose counsel rejected
27   them in mid December 2008.  They also show a January 16, 2009 email from Ms. Futter to Craig Welin confirming
     that the parties would be getting together to discuss arrangements for a "new direction."

28

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

1    Beach agreed to allow a receiver, Robb Evans . . . to oversee the Bank's completion of the

2    Project. . . ." (¶ 22.) The FACC and SACC expand this to allege: "Pursuant to agreement with

3    Carbon Beach, the receiver was immediately appointed without objection.[6] The only other relief

4    sought by the Bank against Carbon Beach was a judicial foreclosure sale. After the Receiver was

5    appointed, the Bank took no further action on the complaint or to collect the Builders' loan." (¶ 31.)

6    It is further alleged that "Carbon Beach allowed a very small bond to be posted because the Bank

7    would be funding the completion of the Property, including the Receiver's expenses." (¶ 33.) It

8    further alleges that after his appointment on October 2, 2008, the Receiver took possession of the

9    Property "on a temporary basis." (¶ 34.) The SACC sets forth various provisions of the order

10   appointing the Receiver and certain matters that the Receiver was supposedly prohibited from doing

11   without further order of Court. (¶¶ 35-38.) The SACC further alleges that over the next several

12   months, the Bank (1) began settling claims with lienholders and to evaluate and prepare a budget for

13   the steps necessary to finish the project and (2) repeatedly advised Carbon Beach that it wanted a

14   new design for the project, that the new design, plans and budgets would be delivered shortly.

15   During this process, the Bank sought approval for certain receivership certificates related to the

16   maintenance of the Property, but "took no other steps in the pending receivership action." (¶ 40.)

17   Throughout the "Negotiations" and "when it entered into the Joint Venture/Partnership with Carbon

18   Beach, the Bank was having regulatory issues and was at or near its lending limit and was unable to

19   fund the Joint Venture/Partnership as it had committed." (¶ 32.)

20        On November 11, 2008, the state court confirmed the appointment of the Receiver. (¶ 42.)

21   "Thereafter, the Receiver began the process of implementing the Joint Venture/Partnership for the

22   Bank rather than simply managing and preserving the Property or following the terms of the

23   appointment order" and "[t]hroughout his tenure, the Receiver worked exclusively with the Bank or

24

25   _____

26   [6] This allegation is contradicted by the allegation in ¶ 18 that it was only the "permanent" appointment of the
     Receiver that was unopposed. Since the Receiver was originally appointed on October 2, 2008 (¶ 34), it can be seen
     from the chronology in ¶ 24 that the alleged "agreement" to the October 2, 2008 ex parte appointment is a false or
27   sham allegation since, under Carbon Beach's chronology, the supposed "Joint Venture/Partnership" was not even
     "suggested" by Builders until October 8, 2008, almost a week later.

28

NOTICE OF MOTION AND MOTION BY BUILDERS BANK TO DISMISS THE FIRST-FOURTH CLAIMS OF
THE SECOND AMENDED COUNTER-CLAIM FOR FAILURE TO STATE A CLAIM

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

1    Saywitz on the actions taken at the project, took all direction from the Bank or Saywitz, selected the

2    Bank's construction manager, and, in fact, acted as the Bank's or Saywitz's agent in the actions it

3    took with respect to the Project, including decisions as to who to hire, what work would be done

4    and pursuant to what contractual terms." (¶ 43.)  Carbon Beach alleges that neither the Bank nor the

5    Receiver informed Carbon Beach of actions taken with regard to the Project, and, while Carbon

6    Beach was being promised that the new plans and budget were being worked on, "the Receiver, at

7    the direction and control of the Bank, had already commenced plan changes, design changes and

8    other changes." (¶ 44.)

9        Carbon Beach alleges that, in response to Builders' request, the Superior Court approved

10   several receivership certificates to fund completion of the Project, which Builders promised to pay

11   but, because of legal lending limits or other regulatory issues, could not pay, in reliance on which,

12   the Receiver engaged contractors who have now not been paid. (Id., ¶¶ 48-55.)  It further alleges

13   that, in breach of the alleged Joint Venture/Partnership agreement, the Receiver and Builders,

14   without Carbon Beach's knowledge, materially changed the scope of the Project, allowed critical

15   insurances to lapse, allowed additional mechanics' liens to be placed on the Project, and expenses to

16   increase, and, by September 2009, the Project was less complete than when the Receiver took

17   control in October 2008.  (¶¶ 56-82.)

18   **C.    The Claims For Relief.**

19       Builders only discusses those claims addressed by this motion.  In its first claim "for fraud in

20   the inducement" (worded identically as alleged in the FACC), Carbon Beach alleges a host of

21   claimed representations "[i]n a series of e-mails and meetings . . . in late 2008 and until September

22   2009" which supposedly induced it to enter into the Joint Venture/Partnership agreement and to

23   agree to the appointment of a Receiver.  (¶¶ 84-91.) (Of course, neither this claim nor any of the

24   other fraud-based claims explain how alleged representations in e.g. June-September 2009 could

25   have induced Carbon Beach to enter into the supposed joint venture/partnership and agree to the

26   appointment of a receiver in the last quarter of 2008.)  The second and third claims allege, as did the

27   FACC, the existence and breach of an "oral contract" and breach of the implied covenant of good

28   faith and fair dealing in connection with the claimed "Joint Venture/Partnership" agreement.

NOTICE OF MOTION AND MOTION BY BUILDERS BANK TO DISMISS THE FIRST-FOURTH CLAIMS OF
THE SECOND AMENDED COUNTER-CLAIM FOR FAILURE TO STATE A CLAIM

1 (¶¶ 93-106.) The fourth claim for "fraud," as did the FACC, alleges a series of telephone, e-mail,

2 mail and in-person representations to Kest, Ross, Davis and Futter by Saywitz, Eidman, Ruvalcaba

3 and Welin "from September 2008 through October 2009 relating to various subjects pertaining to

4 the alleged agreement and the Project" (¶¶ 107-114.)

## II.     PLEADING STANDARDS APPLICABLE TO SACC

### A.     Standard on a Rule 12(b)(6) Motion to Dismiss.

7        In order for plaintiff to survive a Rule 12(b)(6) motion, his claims must meet the standards

8 of pleading enunciated in the Supreme Court's recent decisions in *Bell Atlantic Corp. v. Twombly*,

9 550 U.S. 544 (2007) ("*Twombly*") and *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009) ("*Iqbal*"). To

10 survive a motion to dismiss, a complaint must contain "sufficient factual matter, accepted as true,

11 to state a claim to relief that is plausible on its face." *Iqbal*, 129 S. Ct. at 1949. *Caviness v.*

12 *Horizon County Learning Center. Inc.*, 590 F.3d 806, 812 (9th Cir. 2010) ("*Caviness*"). A claim is

13 facially plausible "when the plaintiff pleads factual content that allows the court to draw the

14 reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S. Ct.,

15 1949; *Caviness*, 590 F.3d at 812. "[A] pleading that offers labels and conclusions or a formulaic

16 recitation of the elements of a cause of action will not do." *Twombly,* 550 U.S. at 555; *Iqbal*, 129

17 S.Ct. at 1949. Thus, "the tenet that a court must accept as all of the allegations contained in a

18 complaint is inapplicable to legal conclusions." *Iqbal*, 129 S.Ct. at 1949. "Conclusory allegations

19 of law and unwarranted inferences are insufficient to defeat a motion to dismiss for failure to state

20 a claim." *Caviness*, 590 F.3d at 812. Courts "do not necessarily assume the truth of legal

21 conclusions merely because they are cast in the form of factual allegations." *Paulsen v. CNF, Inc.*,

22 559 F.3d 1061, 1071 (9th Cir. 2010). "[B]are assertions" and "bald allegations" are rejected

23 because "the allegations are conclusory and not entitled to be assumed true." *Iqbal*, 129 S.Ct. at

24 1951.

25        Determining whether a complaint is "facially plausible" is "a context-specific task that

26 requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 129 S.

27 Ct. at 1950. However, "where the well-pleaded facts do not permit the court to infer more than the

28 mere possibility of misconduct, the complaint has alleged - but it has not shown - that the pleader

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

769134.1 | 100170-0011                                    10

1  is entitled to relief." Id. Moreover, "Where a complaint pleads facts that are 'merely consistent

2  with' a defendant's liability, it stops short of the line between possibility and plausibility of

3  entitlement to relief." Iqbal, 129 S.Ct. at 1949; Twombly, 550 U.S. at 557.

4  **B.**     **Court May Judicially Notice and Consider Documents Alleged In But Not Attached**

5         **to the Complaint or Which Are Integral to and Relied on by the Complaint.**

6         A motion to dismiss may reference and request the Court to take judicial notice of

7  documents alleged in the complaint but not attached to it, without converting the motion to a

8  motion for summary judgment under Rule 56. Knievel v. ESPN, 393 F.3d 1068, 1076-77 (9th Cir.

9  2005), Branch v. Tunnell, 14 F.3d 449, 453-54 (9th Cir. 1994) (overruled on other grounds in

10  Galbraith v. County of Santa Clara, 307 F.3d 1119, 1127 (9th Cir. 2002). Here, Builders' requests

11  that the Court take judicial notice of the contents of the actual emails/letters which are expressly

12  referenced in ¶ 24 of the SACC. Also, because SACC ¶ 16 makes a blanket reference to "a series

13  of telephone conversations, emails, mail correspondence and meetings in late summer/fall 2008,

14  the Bank and Carbon Beach and the principals of Carbon Beach and the Bank negotiated a Joint

15  Venture/Partnership regarding the equity in the Project and its funding and completion going

16  forward (the 'Negotiations')", the Bank requests judicial notice of other emails/correspondence not

17  expressly referenced in the SACC, but which indisputably were part of the discussions, including

18  early emails discussing Builders' challenges with its lending limit as it related to this Project, the

19  documents drafted by Builders' counsel and sent to Carbon Beach's counsel and representatives in

20  late November 2008, the comments by Carbon Beach's counsel in relation thereto in mid

21  December, and an email from Ms. Futter to Mr. Welin dated January 16, 2009 regarding a "new

22  structure" for the transaction which would only include the "Kest Group." Again, even though the

23  mid December 2008 and January 16, 2009 communication come after the specific documents

24  alleged in ¶ 24, the SACC repeatedly alleges that the fraud claims are based on "a series of emails,

25  calls and meetings as described above in late 2008 ***until September 2009***, . . . ." (Emphasis

26  added.) They are then an integral part of the communication or which the SACC is based. These

27  documents, especially the email from Carbon Beach's counsel in mid-December 2008 commenting

28  on the original contract drafts and the email from Ms. Futter in January 2009, can hardly be

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

1    questioned as to authenticity or content and thus they meet the criteria in the Ninth Circuit for

2    judicial notice on a motion to dismiss without converting it to a motion for summary judgment.

3        These other documents are judicially noticeable even though not expressly referenced in

4    the complaint (1) since they are crucial to Carbon Beach's claims, (2) because of the policy

5    concerns underlying the rule of allowing judicial notice of documents referenced in the complaint

6    (preventing plaintiffs from surviving a Rule 12(b)(6) motion by deliberately omitting references to

7    documents upon which their claims are based) and (3) the rule of completeness (FRE 106), i.e., if

8    Carbon Beach is going to base its claims on the unidentified emails and letters, the Court is

9    entitled to see and the Bank is entitled to have those claims considered in light of the entirety of

10   the alleged documents.  See *Parrino v. FHP, Inc.*, 146 F.3d 699, 705-706 (9th Cir. 1998); *Knievel*,

11   393 F.3d at 1076-77 (judicial notice of balance of internet web pages in addition to those pages

12   specifically cited in the complaint); *In re Stac Electronics Securities Litigation*, 89 F.3d 1399,

13   1405 fn. 4 (9th Cir. 1996) (proper for court to consider full text of Prospectus, including portions

14   which were not mentioned in the complaints without converting motion to dismiss into one for

15   summary judgment); *Fech v. Price Co.*, 70 F.3d 1078, 1080 fn. 1 (9th Cir. 1995) (proper for court

16   on motion to dismiss to consider full text of defendants' corporate disclosures and reports quoted

17   in the complaint).  In approving the district court's taking of judicial notice of documents critical to

18   plaintiff's claim but which were not referenced in the complaint, the Ninth Circuit in *Parrino v.*

19   *FHP, Inc., supra*, 146 F.3d at p. 705 cited with approval the Second Circuit case of *Cortec Indus.,*

20   *Inc.* v. *Sum Holding LP*, 949 F. 2d 42, 47 (2d Cir. 1991), which upheld the district court's

21   consideration of a stock purchase agreement and an offering memorandum attached to the

22   defendant's Rule 12(b)(6) motion, because plaintiff's claims were predicated on the document.

23   The court in *Cortec Indus., Inc.* stated at pp. 47-48:

24            [W]e have held that when a plaintiff chooses not to attach to the
             complaint or incorporate by reference a prospectus upon which it
25            wholly relies and which is integral to the complaint, the defendant
             may produce the prospectus when attacking the complaint for its
26            failure to state a claim, because plaintiff should not so easily be
             allowed to escape the consequences of its own failure. . .

27
             A finding that plaintiff has had notice of documents used by
28            defendant in a 12(b)(6) motion is significant since, as noted earlier,

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

1    the problem that arises when a court reviews statements extraneous
2    to a complaint generally is the lack of notice to the plaintiff that they
     may be so considered; it is for that reason – requiring notice so that
     the party against whom the motion to dismiss is made may
3    respond – that Rule 12(b)(6) motions are ordinarily converted into
     summary judgment motions.  Where a plaintiff has actual notice of
4    all the information in the movant's papers and has relied upon these
     documents in framing the complaint, the necessity of translating a
5    Rule 12(b)(6) motion into one under Rule 56 is largely dissipated.

6    We turn now to the case at hand.  Despite the fact that the
     documents attached to defendant Westinghouse's motion to dismiss
7    were neither public disclosure documents required by law to be filed
     with the SEC, nor documents actually filed with the SEC, nor
8    attached as exhibits to the complaint or incorporated by reference in
     it, the district court was entitled to consider them in deciding the
9    motion to dismiss.  The stock purchase agreement, Bowles' offering
     memorandum, and the warrant were documents plaintiff had either
10   in its possession or had knowledge of and upon which they relied in
     bringing suit.  It did not lack notice of those documents; these papers
11   were integral to its complaint.  Consequently, . . . the district
     court. . . could have viewed them on the motion to dismiss because
12   there was undisputed notice to plaintiffs of their contents and they
     were integral to plaintiffs' claim.
13

14          Here, as is demonstrated in § III, below, which sets forth what is in the documents,

15   obviously the full text of the e-mails and letters expressly referenced in the SACC were relied on

16   by Carbon Beach and are integral to its purported claims.  No less integral to its purported claims,

17   are documents comprising the "series of emails and letters" that Carbon Beach generally

18   references as having been what it supposedly "relied on" in acting as it did through September

19   2009.  Indeed, Carbon Beach would be less than candid with the Court if it objects to such

20   documents being considered.[7]

21          Finally, in determining a motion to dismiss under Rule 12(b)(6) it is proper to consider

22   pleadings and court filings.  *Von Saker v. Norton Simon Museum of Art at Pasadena*, 578 F.3d

23   1016, 1021-22 (9th Cir. 2009.)  Accordingly, the Bank requests that the Court take judicial notice of

24   the Bank's complaint, the answer/counter-claim/cross-complaint, the FACC, the Bank's ex parte

---

[7] Should Carbon Beach object to the Court considering any of the documents not expressly referenced in ¶ 24,
Builders requests that, rather than deeming the entire motion a summary judgment motion, the Court rule on this
motion as a Rule 12(b)(6) considering those documents which the Court believes are appropriate for such purpose.

NOTICE OF MOTION AND MOTION BY BUILDERS BANK TO DISMISS THE FIRST-FOURTH CLAIMS OF
THE SECOND AMENDED COUNTER-CLAIM FOR FAILURE TO STATE A CLAIM

1  application for appointment of a receiver, the order confirming appointment of the receiver, the

2  various applications for receivership certificates, and the several stipulations to continue the hearing

3  date on the Bank's attachment application against Ross.

4  **C.    Pleading Rules for Fraud Claims.**

5       To plead fraud under FRCP 9(b), incorporated into FRBP 7009, in all averments of fraud,

6  the circumstances constituting fraud shall be stated "with particularity." See *Desaigoudar v.*

7  *Meyecord*, 223 F.3d 1020, 1022-1023 (9th Cir. 2000) (fraud must be pled "with a high degree of

8  meticulousness"). Allegations that are insufficient to satisfy the "particularity" requirement of

9  Rule 9(b). *Moore v. Kayport Package Express, Inc.*, 885 F.2d 531, 540 (9th Cir. 1989.) A fraud

10  claim must "adequately specify the statements it claims were false or misleading, . . . state when

11  and where the statements were made, and identify those responsible for the statements," i.e. a

12  fraud claim must state the "time, place, persons, statements made, explanation of why or how such

13  statements are false or misleading." *In re Glenfed, Inc. Securities Litigation*, 42 F.3d 1541, 1547

14  fn. 7 (9th Cir. 1994). "[E]very element of the cause of action for fraud must be alleged in the

15  proper manner and the facts constituting the fraud must be alleged with sufficient specificity to

16  allow defendant to understand fully the nature of the charge made." *PM Factors Inc. v. Kreisel (in*

17  *re Kreisel)*, 399 B.R. 679, 671 (Bankr. C.D. Cal. 2008). "This entails a showing of 'how, when,

18  where, to whom and by what means the representations were tendered.'" Id., 399 B.R. at 691, 692

19  (fraud claims based on alleged oral misrepresentations dismissed, among other reasons, because

20  "timing of such representations is not indicated ..."). Generally, the pleader must also identify the

21  actual source of the fraud, i.e. whether written or oral and if written, the particular documents

22  involved. *Exergen Corp. Walmart Stores, Inc.*, 575 F.3d 1312, 1329 (Fed. Cir. 2009).

23       "[T]o recover for fraud ... the plaintiff must plead and prove the 'detriment proximately

24  caused' by the defendant's tortious conduct." *In re Washington Trust Deed Service Corp.*, 224

25  B.R. 109, 113 (9th Cir BAP 1998). "Whatever form it takes, the injury or damage must not only

26  be distinctly alleged but its causal connection with the reliance on the representations must be

27  shown." (*Id.*) "Misrepresentation, even maliciously committed, does not support a cause of action

28  unless the plaintiff suffered consequential damages. And the damages suffered must be referable

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

1  to, and caused by, the fraud." (*Id.*) "In fraud, the pleading must show a cause and effect

2  relationship between the fraud and damages sought; otherwise no cause of action is stated." (*Id.*)

3  ### III.    BUILDERS' REQUEST FOR JUDICIAL NOTICE

4    The documents specifically referenced in SACC ¶ 24 state:

5    10/8/2008 – On October 8, 2008 Ross emailed to Saywitz, App.,[8] Exh. 12:[9]

6  > Mitchell:

7  > Thanks for the call this morning.

8  > I believe your proposal was a step in a positive direction and something I think we can work out.

9  > While ***I understand nothing you send at this stage is binding***, after speaking with some of my people, it would be real helpful if you could clearly and simply as you did on the phone lay out the 14 or 15 points we discussed. [Emphasis added.]

11  > That way when I meet with everyone there will be no misunderstanding when I relay out your proposal.

12  > Again, thanks for the efforts to work something out.

13  > Mark
> Mark Ross

14  10/8/2008 – On October 8, 2008 Saywitz emailed to Ross, App., Exh. 13:

15  > Mark,

16  > Per your request, here is my attempt to lay out what I was suggesting on the phone today ***as a possibility. However, this should not be construed in any way as an offer to lend, or an offer to modify in any way the loan documents or the proceedings that have taken place, and the Bank reserves all of its rights with respect to the loan, loan documents, legal proceedings, and its rights and remedies***. [Emphasis added.]

20  > In exchange for a release under the guaranty, an entity controlled by the bank would take ownership of the collateral under the loan, including the real property, contracts, plans, permits, etc., subject to the existing lien of the bank (so that we have the flexibility of an uncontested foreclosure as a way to deal with mechanics liens or other title issues). However, the current borrower and owner of the property would be provided an economic benefit in the form of a share in the profits in the eventual disposition of the collateral.

24  > It seems to me that there are a few issues major issues that would

---

26  [8] "App" refers to the Appendix of Exhibits attached as part of Builders' RFJN.

27  [9] While this email is not expressly referenced, the Saywitz October 8, 2008 email alleged in the SACC is in reply to this one.

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

1   need to be ironed out.

2   First is the definition of the "share in the profits" granted to the
    current borrower. I would envision a formula that established a
3   priority payment to the bank that would start with the current
    outstanding balance on the loan, then added all incurred costs, both
4   internal (accounting, construction supervision, etc.) and external
    (construction, marketing, taxes, etc.), an imputed "interest rate" on
5   the starting balance and all incurred costs and a reasonable "project
    management" or "development" fee. The "share in the profits"
6   would then simply be a fixed percentage of each dollar of excess
    proceeds from the sale of the collateral after the priority payment to
7   the bank.

8   Second, is to find a process and/or structure that will eliminate the
    Bank's exposure to construction defect liability.

9   Third, is to provide the current borrower with "comfort" that the
    Bank will act in a manner to maximize excess proceeds. Obviously,
10  the Bank will have an economic incentive to do so, since it also
    shares in every dollar of excess proceeds. However, I recognize the
11  concern of the borrower that the Bank may elect to do no more that
    is necessary to obtain its priority payment, which would limit or
12  eliminate the borrower's payment that may otherwise be available.
    It is not clear that much can be done here to provide comfort, since
13  the Bank will insist on unfettered control. However, we are open to
    suggestion.

14  My current thinking regarding the business plan that would be
    initially pursued by the Bank would be to complete the project, and
15  then market and sell the individual units. The Bank would advance
    all the necessary funds to prosecute the business plan. Our initial
16  thought would be to negotiate a price for the General Contractor to
    finish the project on an expedited basis, and to hire a reputable
17  broker to market and sell the units. We would welcome Mark's
    assistance in all phases, and would start out with the assumption that
18  the current broker, associated vendors, and marketing strategy is
    appropriate to use. We can be more specific regarding the business
19  plan, and even agree formally that it is by definition is the initial
    approach by the Bank and one that both parties agree is appropriate.
20  However, given today's volatile economy, the Bank could not be
    bound to any one plan and would need to have unfettered control to
21  modify the business plan as it deems appropriate.

22  The advantage of this overall approach is that the Bank is in a
    unique position because in today's difficult environment it is a
23  reliable source of funds, and due to its first lien, it is in a favorable
    position with respect to negotiating a favorable price for the
24  completion of construction.

    Chatima Tova,
25  Mitchell Saywitz

26   10/17/2008 – On October 17, 2008, Shannon Eidman of Builders transmitted a proposed

27  letter to Ross, per Ross's request on the October 15 meeting, App. Exh. 15:

28   October 17th, 2008

NOTICE OF MOTION AND MOTION BY BUILDERS BANK TO DISMISS THE FIRST-FOURTH CLAIMS OF
THE SECOND AMENDED COUNTER-CLAIM FOR FAILURE TO STATE A CLAIM

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

Mark Ross
Villa Development, LLC
5016 N. Parkway Calabasas
Ste. 205
Calabasas, CA 91302

Re: Carbon Beach Partners, LLC
22065 Pacific Coast Highway, Malibu, CA (the "Property")

Dear Mr. Ross:

The purpose of this letter is to outline the conceptual terms discussed at the meeting on Wednesday, October 15th, 2008 in order to keep the development of the above referenced Property moving forward.

***All of the terms of this letter are subject to documentation acceptable to all parties, including the Bank, and does not constitute an approval by the Bank of any of the conceptual terms described herein, either express or implied, on behalf of the Bank and does not impose any obligation on the Bank to proceed with the conceptual terms as follows*** [Emphasis added]

- The Borrower and Guarantor shall consent to confirmation of the court appointed Receiver (the "Receiver");

- The Receiver shall oversee all aspects for completion of the development and sale of the Property. In addition, the Borrower agrees that sole control and authority shall vest in the Receiver and be relinquished from the Borrower for completion of the development and sale of the Property;

- All advances in furtherance on completing the development of the Property will be made through the Receiver utilizing Receiver's Certificate which shall have priority over all other liens;

- Upon the sales of the units, whether individually or in bulk, the proceeds will be used to pay the Receiver's Certificate first and then to pay all the proceeds disbursed by the Bank under its note;

- Upon payment of all the costs and fees associated with the Property, the Bank and the Borrower shall share equally in the profits from the sale of the units, either individually or in bulk. This Profit Participation shall be inclusive even in the event the Bank's note is paid in full prior to completion of the development or sale of the Property;

- The Bank will be paid a modification/extension fee in the amount of $500,000;

- Effective June 5th, 2008, the interest rate shall be fixed at 8.0% and shall apply to all loan proceeds and any funds advanced to the Receiver;

- The default rate will be 24%;

NOTICE OF MOTION AND MOTION BY BUILDERS BANK TO DISMISS THE FIRST-FOURTH CLAIMS OF
THE SECOND AMENDED COUNTER-CLAIM FOR FAILURE TO STATE A CLAIM

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

- The Bank will release Mark Ross and the Ross Family Trust guarantees upon terms remaining to be discussed with the Bank;

- The documentation formalizing these terms shall be executed by November 13th, 2008.

***However, the Bank intends to proceed with its pending litigation until an agreement acceptable to all parties has been documented and executed.*** [Emphasis added.]

Sincerely,
Shannon P. Eidman
Senior Vice President, Regional Manager

10/31/2008 – On October 31, 2008 Eidman emailed to Ross, transmitting a letter with a revised proposal, App., Exh. 16:

October 31st, 2008

Mark Ross

Villa Development, LLC
5016 N. Parkway Calabasas
Ste. 205
Calabasas, CA 91302

Re: Carbon Beach Partners, LLC
22065 Pacific Coast Highway, Malibu, CA (the "Property")

Dear Mr. Ross:

The purpose of this letter is to outline the conceptual terms discussed at the meeting on Wednesday October 29th, 2008 in order to keep the development of the above referenced Property moving forward. ***All of the terms of this letter are subject to documentation acceptable to all parties, including the Bank, and does not constitute an approval by the Bank of any of the conceptual terms described herein, either express or implied, on behalf of the Bank and does not impose any obligation on the Bank to proceed with the conceptual terms as outlined below*** [Emphasis added]:

- The Borrower and Guarantors shall consent to confirmation of the court appointed Receiver (the "Receiver");

- During the pendency of the Receivership, the Receiver shall oversee all aspects for completion of the development and sale of the Property. In addition, the Borrower agrees that sole control and authority shall vest in the Receiver and be relinquished from the Borrower for completion of the development and sale of Property;

- During the pendency of the Receivership, all advances in furtherance on completing the development of the Property will be made through the Receiver utilizing Receiver's Certificate which shall have priority over all other liens;

- Upon the sales of the units, whether individually or in bulk, the proceeds will be used to pay the Receiver's Certificate first and then

NOTICE OF MOTION AND MOTION BY BUILDERS BANK TO DISMISS THE FIRST-FOURTH CLAIMS OF
THE SECOND AMENDED COUNTER-CLAIM FOR FAILURE TO STATE A CLAIM

to pay all outstanding obligations owed to the Bank under its note and related loan documentation, including, but not limited to, all legal costs, accrued interest and the modification/extension fee described below. In addition, the Receiver's fees and costs will be paid through either the Receiver's Certificate and/or the sale of the units;

• Upon payment of all the costs and fees associated with the Property, including but not limited to those items referenced above, available proceeds from the sale of subsequent units shall be disbursed to the Borrower until such time as its cash contribution at the original closing of the Bank's loan is reimbursed in the approximate amount of $1,694,152, then to the Bank and the Borrower in equal shares (the "Profit Participation"). Irrespective of whether the Bank's loan is paid through the sale of individual units, a bulk sale or other form of repayment, the Profit Participation will apply.

• The Bank will be paid a modification/extension fee in the amount of $500,000;

• Effective retroactive to June 5th, 2008, the interest rate shall be fixed at 9.5% and shall apply to all loan proceeds and any funds advanced to the Receiver;

• The default rate will be 24%;

• The Bank will release Mark Ross and the Ross Family Trust guarantees upon terms remaining to be discussed with the Bank;

• *The documentation formalizing these terms shall be executed by November 13th, 2008.*

*However, the Bank intends to proceed with its pending litigation until an agreement acceptable to all parties has been documented and executed.* [Emphasis added.]

Sincerely,

Shannon P. Eidman
Senior Vice President, Regional Manager

Although not specifically referenced in the SACC, the following are integral to Carbon Beach's claim and comprise a part of the "emails and correspondence" between September 2008 and September 2009 on which Carbon Beach purportedly "relied":

First, November 25, 2008 email from Builders' counsel to Carbon Beach and its counsel sending proposed contract documents. (Exh. 18).

Second, response of Carbon Beach counsel thereto:

12/15/2008 – Welin, of Frandzel, received an email from Rallis (Kest's attorney), App. Exh. 19:

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

From: Rallis, Dean [mailto:Dean.Rallis@alston.com]
Sent: Monday, December 15, 2008 4:52 PM
To: Craig Welin
Cc: cfutter@futterwells.com; JPN@msk.com; mross@villallc.com;
rdavis@gkind.com; Begun, Andy

Subject: Builders Bank vs. Carbon Beach - Comments to Draft
Settlement Agreement

CONFIDENTIAL SETTLEMENT NEGOTIATIONS

Craig -

In response to the draft settlement agreement, we have reviewed the
draft and provide below general responses to the draft. We believe
it would be more productive to address these general matters in
advance of specific comments to the agreement. Please review the
comments below with your client and let us know a convenient time
to address these points.

1.      Generally, this is a loan workout agreement with respect to the
defaulted loan and a settlement and release agreement with respect
to the enforcement actions commenced by the bank. A portion of the
workout fee/settlement compensation comes in the form of a back
end interest in any remaining profits. The parties' rights and
obligations under this Agreement should be more clearly defined
under the agreement to crystallize how the project will be operated
going forward.

2       The document needs to outline the bank's obligations to fund
both the receiver and the contractors (including those who have filed
liens), payments of taxes, insurance, and other property expenses,
covenants as to marketing, commercial reasonableness, etc.

3.      This is not a standard modification agreement. Accordingly,
many of the covenants, reps, warranties, etc. make no sense in this
agreement and/or are simply no longer true.

4.      The receiver should continue to work cooperatively with us in
compromising claims to protect the LLC. On sales of units, we can
agree to certain price ranges (perhaps agreeing to floor prices for
each unit), but in all circumstances, the receiver needs to get court
approval before selling units and the bank and the receiver need to
be held to a standard of good faith and commercial reasonableness.
In addition, the receiver needs to provide us and the bank as to
financial accounting (note that we still are required to prepare our
own tax returns). We also need to deal with the present and
prospective lawsuits and how those will be handled.

5.      The distributions should be made to equity and the bank after
payment of unsecured claims against the LLC (otherwise fiduciary
duty/illegal dividend issues may arise). Also any reserves should
only be in amounts not covered by insurance (i.e., the deductibles)
and should be limited in time.

6.      Any foreclosure by the bank needs to be "friendly" and with
our consent and our deal in place regardless of circumstances. The

NOTICE OF MOTION AND MOTION BY BUILDERS BANK TO DISMISS THE FIRST-FOURTH CLAIMS OF
THE SECOND AMENDED COUNTER-CLAIM FOR FAILURE TO STATE A CLAIM

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

1  parties need to agree on price ranges, marketing efforts/costs, etc. to
2  protect the parties' respective interests in the project.

7.    Once the bank is paid on its secured debt, the receiver should
3  be discharged.

4  8.    The LLC's manager and/or a member is a decision to be made
   by the members, not by the bank.
5
6  9.    Defaults should be mutual and should track each sides'
   obligations under this agreement. Remedies should be for breach of
7  the agreement, nothing further.

8  10.    All covenants against filing bankruptcy and all the other
   bankruptcy waivers need to deal with a "friendly" chapter 11 and
9  our client's right to file in the event that the bank breaches the
   agreement, or action/inaction by the receiver that compromises the
10 interests of our client, or in the event of an involuntary filing.

11 11.    There is no basis for any clawbacks under the agreement.

12 12.    The agreement should not include a default provision if the
   units are not sold in 5 years.  There is no reason for the LLC to incur
13 such an event if the parties are not able to sell the units in this time
   period.  We can address what will happen if this occurs, but it
14 should not result in a default by the LLC.

15 13.    Any releases address past events, not future conduct (for
   either side) and does not include the receiver.

16 14.    The Ross guaranties should be released entirely.

17 15.    Though this point specifically addresses the default provision
   in the agreement, the defaults as defined need to be revised. For
18 example, there is a reference to the LLC's failure to make payments
   when due (para.15(a)), yet the agreement does not address payments
19 by the LLC.  If this term is intended to reflect an obligation of the
   LLC to continue to make payments to the bank under the Loan
20 Documents, this seems to conflict with the general intent of this
   agreement.
21
   We have not provided line by line comments at this time as we need
22 to deal with these larger issues before getting down to more
   detailed/mundane issues.
23
   Call/email with any questions.
24

25 Thanks.
   Dean

26 ///

27 ///

28 ///

NOTICE OF MOTION AND MOTION BY BUILDERS BANK TO DISMISS THE FIRST-FOURTH CLAIMS OF
THE SECOND AMENDED COUNTER-CLAIM FOR FAILURE TO STATE A CLAIM

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

1   Third, Ms. Futter's January 16, 2009 email to Welin, counsel for Builders (App., Exh. 31):

2       Hi Craig:

3       I don't know if you have heard from Mitch yet, but we had a meeting
yesterday *to discuss a new arrangement going forward.* There are
4   many structural issues to discuss and Mitch indicated I should speak
with you. I cannot meet today as I have previous business
5   commitments. How does your Monday look? I can come your way.
*As this will be a deal with the Kest Group and the Bank, it will just*
6   *be me.*

7       In the meantime, Mitch indicated that if we have any deadlines
coming up, we should move them for a short period of time *to see if*
8   *we cannot make this new structure work.*

9       As I understand it, Carbon Beach's answer is due on the 20th, which
is Tuesday. *Can we move it a week or so until we can meet and*
10  *come up with a structure that works for all of us.* (Emphasis
added.)

11

12      Please let me know.

        Thank you.
13
        Cynthia Futter
14      Futter-Wells, PC

15      Moreover, with respect to the allegations in ¶ 32 that Builders did not inform Carbon

16  Beach of any potential problems with its legal lending limit, one of the September 2008 emails

17  among those of the September 2008 – September 2009 emails Carbon Beach alleges it relied on is

18  a September 24, 2008 email from Saywitz to Ross:

19      9/24/2008 – On September 24, 2008, Saywitz sent the following email to Ross attached to

20  the App. as Exh. 7.

21      Mark,

22      Based on our calculations and assumptions, this is how the budget
plays out. *As I mentioned before, we are right at our legal limit, so*
23  *this is the best we can do.* As you suspected, we needed to back-
end all of the fees to get enough room for the interest reserve.
24  *Please note that this is a continuation of my previous email, and*
*consequently, please understand that this proposal is non-binding*
25  *and does not constitute an offer to lend or an offer to modify the*
*current loan in any way. Furthermore, this proposal is subject to*
26  *further due diligence and underwriting by the Bank, and any of*
*the proposed terms may change as a result.* [Emphasis added.]

27

28

NOTICE OF MOTION AND MOTION BY BUILDERS BANK TO DISMISS THE FIRST-FOURTH CLAIMS OF
THE SECOND AMENDED COUNTER-CLAIM FOR FAILURE TO STATE A CLAIM

# IV.    **DISCUSSION**

**A.    The Fraud Claim Must Be Dismissed.**

Despite the added allegations as to specific emails and correspondence in the September-November 2008 timeframe, the fraud claim purports to rely not only on these emails but alleged representations between that time and October 2009 (¶¶ 85, 109), none of which are set out with any--let alone the required--degree of specificity under Rule 9(b).  Second, fraud obviously requires a pleading of reliance in fact and justified reliance.  *Lazar v. Superior Court*, 12 Cal.4th 631, 638 (1996); *Kruse v. Bank of America*, 202 Cal.App.3d 38, 62-63 (1988).  Yet, with no pleading setting forth these other alleged representations which supposedly occurred into October 2009, the SACC is utterly lacking in specificity in this regard.

As to the communications expressly alleged in the SACC between September - November 2008, as can be seen from the writings themselves, there was no binding joint venture promise or agreement ever made which could be the subject of a fraudulent promise claim.  See Ross's October 8, 2008 email, (App., Exh. 12), stating that Carbon Beach understood "nothing you send at this stage is binding."  The communications from Builders of October 8, 2008 (App., Exh. 13), October 17 (App., Exh. 15) and October 31, 2008 (App., Exh. 16), each reiterate (1) that the communications "should not be construed in any way as an offer to lend, or an offer to modify in any way the loan documents . . . ," (2) that the communications "do not impose any obligation on the Bank to proceed with the conceptual terms . . . ," (3) that "the Bank intends to proceed with its pending litigation until an agreement acceptable to all parties has been documented and executed," and (4) that "[a]ll terms of this letter are subject to documentation acceptable to all parties, including the Bank . . . ."  This negates, as a matter of law, not only the existence of a binding promise or agreement of any kind but any notion that Carbon Beach could have reasonably relied thereon as establishing a joint venture agreement.  See *Kruse*, 202 Cal.App.3d at 54-55, 64-65 (fraud claims not cognizable where discussions constituted preliminary negotiations and expressions of interest); *Laks v. Coast Fed. Sav. & Loan Assn.*, 60 Cal.App.3d 885, 893 (1976) (promissory estoppel case, absent agreement on all material terms, as a matter of law, there could be no justifiable reliance necessary to state such a claim); *Conrad v. Bank of America*, 48

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

1   Cal.App.4th 133, 156 (1996) (plaintiff's understanding or expectation that Bank would extend a

2   loan not sufficient to establish an agreement to make a loan on which a promissory fraud claim

3   can be based).

4        That no agreement was ever reached is manifest from the December 15, 2008

5   communications from the attorneys for Kest (a principal of Carbon Beach) rejecting the proposed

6   agreement sent by Builders' counsel (App., Exh. 19) and the January 16, 2009 email from

7   Ms. Futter to Mr. Welin, counsel for Builders, acknowledging that the parties were going to

8   "discuss a new arrangement going forward" between "the Kest Group and the Bank . . . ." (App.,

9   Exh. 31.)

10       Accordingly, the first and fourth claims should be dismissed with prejudice.

11   **B.   No Joint Venture Agreement Claim.**

12       While the Court denied Builders' motion to dismiss the contract claims as to the FACC, the

13   new allegations of the SACC, coupled with the matters of which the Court should take judicial

14   notice, show, as a matter of law, that no joint venture agreement was ever formed.  As explained in

15   *Beck v. American Health Group Internat., Inc.*, 211 Cal.App.3d 1555, 1562 (1989):

> Whether a writing constitutes a final agreement or merely an
> agreement to make an agreement depends primarily upon the
> intention of the parties.  In the absence of an ambiguity this must be
> determined by a construction of the instrument taken as a whole.
> Preliminary negotiations or an agreement for future negotiations are
> not the functional equivalent of a valid, subsisting agreement.  A
> manifestation of willingness to enter into a bargain is not an offer if
> the person to whom it is addressed knows or has reason to know that
> the person making it does not intend to conclude a bargain until he
> has made a further manifestation of assent. ***Thus, where it is part of
> the understanding between the parties that the terms of their
> contract are to be reduced to writing and signed by the parties, the
> assent to its terms must be evidenced in the manner agreed upon
> or it does not become a binding or completed contract.*** (Emphasis
> added.)

24       The Ninth Circuit recognizes this as a correct statement of California law.  See *Rennick v.*

25   *O.P.T.I.O.N. Care, Inc.*, 77 F.3d 309, 315 (9th Cir. 1996).  *Rennick* discussed a "letter of intent,"

26   describing it as implying, "unless circumstances suggest otherwise, that the parties intended it to

27   be a non-binding expression in contemplation of a future contract, as opposed to its being a

28   binding contract." (77 F.3d at 315.)  "Commonly a letter of intent is used so that people

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

NOTICE OF MOTION AND MOTION BY BUILDERS BANK TO DISMISS THE FIRST-FOURTH CLAIMS OF
THE SECOND AMENDED COUNTER-CLAIM FOR FAILURE TO STATE A CLAIM

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

1  negotiating toward an agreement, who do not yet have one, can get their preliminary inclinations

2  down on paper without committing themselves.  This avoids a misunderstanding that a

3  commitment has been made.  It also has the value in preserving a common understanding of what

4  has been talked about in earlier negotiations, before spending the time and money on later

5  negotiations, and justifies further expenditures on attorneys and others." (Id.) "All these purposes

6  are defeated if what was meant to be a non-binding letter of intent is allowed to form the basis for

7  a damages award.  Letting a non-binding letter of intent go to a jury as a possible basis for

8  compensatory and perhaps punitive damages makes it too risky to sign one, so negotiators are

9  deprived of this useful intermediate device between vague feelers and a binding contract." (Id.)

10  Although recognizing that a letter of intent may in certain circumstances constitute a contract (Id.),

11  *Rennick* held that the wording of the document in that case made it clear that the parties were not

12  to be bound until a final formal agreement was entered into. (Id., at 315-16.)  Thus, the letter of

13  intent document did not create the joint venture agreement. (Id., at 317.)

14       The same can be said for the document at issue in *Beck*.  In *Beck*, the written letter

15  referenced what was to be "our future agreement" and discussed that the parties contemplated

16  forwarding same "for the drafting of a contract" after which, "we will discuss it, and hopefully

17  shall have a completed contract . . . ." (211 Cal.App.3d at 1562-63.)

18       Here, the emphasized portion of the emails and correspondence relied upon by Carbon

19  Beach as supposedly setting forth the joint venture agreement and related representations show, on

20  their face, as did the documents in *Rennick* and *Beck*, that the parties contemplated a formal, final

21  agreement the terms of which would be agreeable to all parties that was signed by all parties.  It is

22  just as clear from the December 2008 and January 2009 communications (App. Exhs. 19, 31), that

23  are integral to the SACC, that no final, binding version was ever agreed to between the parties

24  arising out of the communications specifically alleged in the SACC and that by mid-January 2009

25  the parties were back to the proverbial drawing board.  In the absence of any allegations of further

26  discussions, negotiations, or agreements, the SACC utterly fails to state the existence of a binding

27  joint venture agreement and its supposed terms.

28       Accordingly, the second and third claims for breach of oral contract and breach of the

1  implied covenant of good faith and fair dealing should be dismissed, with prejudice.

2                          **V.    CONCLUSION**

3      For the foregoing reasons, the motion to dismiss should be granted.

4

5  DATED:  December 1, 2010                FRANDZEL ROBINS BLOOM
                                              & CSATO, L.C.
6                                          THOMAS M. ROBINS, III
                                           CRAIG A. WELIN
7                                          BERNARD R. GIVIN II

8

9                                          By:  /s/ Thomas M. Robins, III
                                               THOMAS M. ROBINS, III
10                                              Attorneys for Attorneys for Plaintiff and
                                               Counter-Defendant BUILDERS BANK
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000